UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

KENNETH M. NJEMA,                                    Civ. No. 13-519 (PJS/JSM)

      Plaintiff,                               **REPORT AND RECOMMENDATION**

v.

WELLS FARGO BANK, N.A.,

      Defendant.

The above matter came before the undersigned on defendant's Motion for Summary Judgment [Docket No. 188].  Jonathan Drewes, Esq. appeared on plaintiff's behalf.  Charles F. Webber, Esq. and Jessica Z. Savran, Esq. appeared on defendant's behalf.  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(A), (B), and Local Rule 72.1(c).  [Docket No. 99].

## I.  FACTUAL BACKGROUND

The following facts are recited in the light most favorable to plaintiff Kenneth Njema.

### A.    Defaults and Loan Modification

Njema and his sister Hellen borrowed $178,050 from Universal American Mortgage in May, 2005, and purchased a townhome in Cottage Grove, Minnesota ("Property").  Wells Fargo's Appendix of Exhibits in Support of Motion for Summary Judgment ("WF Appx."), pp. 1-2 (Note) [Docket No. 191].  The loan was secured by a mortgage in favor of Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for Universal American Mortgage.  Id., pp. 3-12 (mortgage).  Paragraph 9(d) of the mortgage stated:

> **Regulations of HUD Secretary**. In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

Id., p. 7.

The loan was insured by the U.S. Department of Housing and Urban Development ("HUD"). Id., p. 4. Wells Fargo serviced the loan on behalf of Universal American Mortgage.

The Njemas defaulted on their loan in 2007. WF Appx., p. 13 (July 18, 2007 letter from Wells Fargo to the Njemas describing HUD partial claim process, which would pay the Njema's delinquent payments of $6871.02). The Njemas gave HUD a second mortgage on the Property to secure the loan and, as a result of the HUD loan, became current on their payments. Id. at 17-22 (mortgage in favor of HUD).

In 2009, the Njemas defaulted on their loan. Id., pp. 23-24 (letter from Wells Fargo to the Njemas dated October 4, 2009, stating that their loan was in default by $4231.72). The Njemas negotiated with Wells Fargo for a loan modification and Wells Fargo agreed to drop the loan interest rate from 5.75% to 4.85%, which lowered the Njemas' monthly payments. Id., pp. 36-38 (loan modification agreement dated July 6, 2010). By February 6, 2011, the Njemas defaulted again and were $6821.64 in arrears on the modified mortgage. Id., pp. 39-40 (letter from Wells Fargo to the Njemas). In March, 2011, Njema told a Wells Fargo representative in a phone conversation that he was not interested in another loan modification, he did not want to make a payment, and he wanted to put the Property up for a short sale. Id., p. 44 (transcript of telephone call

between Njema and a Wells Fargo representative on March 11, 2011); p. 246 (excerpt

of Njema's deposition).

On August 3, 2011, MERS assigned the mortgage to Wells Fargo and Wells

Fargo became the mortgagee.   Id., p. 197 (recorded Corporate Assignment of

Mortgage).

### B.   Short Sale Purchase Offers

Because HUD insured the mortgage loan, HUD's approval was required for a

short sale.   Id., pp. 64 (HUD Approval to Participate dated October 22, 2011).   HUD

approved the Njemas for participation in a short sale program on the following terms:

> The property must be listed for sale . . . for a list price at or
> near $102,000, which is the "AS IS" value indicated on the
> appraisal of your property.
>                                         ***
> Your deadline to obtain a signed Contract of Sale from a
> qualified buyer is 02/22/2012.   If you have not been able to
> obtain an acceptable contract by that date, your mortgagee
> must recommence foreclosure or accept a deed-in-lieu of
> foreclosure.

Id.

Njema received a purchase offer for $102,000 on November 18, 2011.   Id., pp.

69-77 (Purchase Agreement and Counteroffer Addendum).   On January 19, 2012, Wells

Fargo approved the purchase offer, provided the sale close by February 19, 2012.   Id.,

p. 78 (letter from Wells Fargo to the Njemas approving short sale and describing sale

details).   The approved seller's closing costs included $1,460.00 in past due

homeowner's association dues and $754.13 for past due water bills.   Id.   A lien had

been recorded in favor of the homeowner's association on August 28, 2007, in the

amount of $2264.64.   Id., p. 81 (recorded lien statement).   The realtor representing the

Njemas in the short sale testified that she told Njema that "whatever the amount was [that was owed] would have to be paid up before a closing could happen, and that whether he was going to cover that cost or he and Hellen between the two of them that that was—that would come up and it would need to be addressed." Id., p. 213 (excerpt of deposition transcript of realtor Renae Hrastich).  Hrastich wrote to the Njemas on January 27, 2012, stating that factoring in what Wells Fargo was willing to contribute and what the collection agency attempting to collect the overdue homeowner's association fees was willing to discount, the Njemas would still need to come up with $500.  Id. p. 84 (email from Hrastrich to Njema).  Hrastrich asked that the Njemas "let [her] know when you have had a chance to discuss how you will cover the remaining balance between the two of you."  Id.  After considering the $1460.00 that Wells Fargo was willing to cover, the Njemas owed $470.00 in association due and $100 in additional dues.  Wells Fargo Supplemental Appendix ("WF Suppl. Appx."), pp. 287, 288 [Docket No. 200-1].

On February 6, 2012, Hrastich wrote to the Njemas, stating that she would send a letter to Wells Fargo explaining that they needed an extension of time for the closing. WF Appx., p. 86 (email from Hrastich to the Njemas enclosing draft letter to Wells Fargo).  The draft letter stated that the Njemas "need more time to earn the amount of money needed to pay off the association dues and water bill that are necessary in order for this file to close.  They feel confident that with this extension they will be successful in fulfilling this requirement."  Id.

Unfortunately, the buyer cancelled the purchase agreement on February 6, 2012. Id., p. 88 (Cancellation of Purchase Agreement form).  Hrastich testified that she

understood that "the buyers were very interested in purchasing other properties and just got tired of waiting." Id., p. 215 (excerpt of Hrastich deposition).

After the first offer was rescinded by the buyer, Wells Fargo reviewed the loan to determine if it could accept a deed-in-lieu of foreclosure, but concluded it could not because the program requires clear title and the title on the Property carried a lien for the unpaid association dues. Id., pp. 238-40 (excerpt of 30(b)(6) deposition of Wells Fargo representative Susan Rowles).

The Njemas received a second purchase offer on February 26, 2012—four days after the February 22, 2012 deadline established by HUD. Id., pp. 89-96 (Purchase Agreement). This offer was for $90,000, less than HUD's required sale price of $102,000. Id. Njema made a counteroffer to the buyer in the amount of $102,000, but the buyer rejected it. Id., p. 99 (email from realtor Tom Hrastich to Wells Fargo representative dated April 19, 2012). Wells Fargo sought a variance from HUD, which was denied. Id., p. 97 (email from Wells Fargo representative to Tom Hrastich dated May 3, 2012). As a result, Wells Fargo rejected the offer. Id.

The Njemas received a third purchase offer on May 22, 2012, long after HUD's deadline. Id., pp. 104-111 (Purchase Agreement). This offer was for $100,000, which included $2,000 in earnest money. Id. Wells Fargo sought updated information from the Njemas before it could review this offer, including a current hardship letter, and current income and financial information. Id., p. 112 (email from Wells Fargo representative to Tom Hrastich dated June 13, 2012). The Hrastichs forwarded Wells Fargo's requests to the Njemas on June 18, 2012. Id., p. 114 (email from the Hrastichs to the Njemas). Renae Hrastich testified that the Njemas did not provide the information

Wells Fargo sought.  Id., p. 221 (excerpt of Renae Hrastich deposition transcript).  On June 27, 2012, Wells Fargo contacted Tom Hrastich and sought a report on when updated financial information would arrive and stated that it needed the information by the close of business on July 3, "to keep this file alive."  Id., p. 115 (email from Wells Fargo representative to Tom Hrastich).  HUD ultimately rejected this purchase agreement because "documents needed for review [were] not received."  Id., p. 117 (HUD Sales Contract Review form dated July 11, 2012).

### C.    Foreclosure

In April, 2012, Wells Fargo commenced foreclosure proceedings, which culminated in a sheriff's sale of the Property on May 31, 2012.  Id., pp. 198-205 (Sheriff's Certificate of Sale).  Wells Fargo purchased the Property for $182,209.58—the total amount outstanding in principal, interest, fees and costs.  Id., p. 237 (excerpt of 30(b)(6) deposition of Wells Fargo representative Susan Rowles).  The Njemas did not redeem the Property during the six-month statutory redemption period, which expired on November 30, 2012.

### D.    Property Inspections by MCS

The mortgage authorized Wells Fargo to "inspect the Property if the Property is vacant or abandoned or the loan is in default.  Lender may take reasonable action to protect and preserve such vacant or abandoned Property."  Id., pp. 5-6 (Mortgage).  Additionally, HUD regulations governing loans insured by HUD state:

> The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date, and efforts to reach the

6

mortgagor by telephone within that period have been unsuccessful, the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant. The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary, if such action does not constitute an illegal trespass.

24 C.F.R. § 203.377.

Wells Fargo contracted with Mortgage Contracting Services ("MCS") to inspect the Njemas' property two times a month after they defaulted on their loan. Id., pp. 227-228 (excerpt of 30(b)(6) deposition of Wells Fargo representative Chad Soppe). These inspections are performed on behalf of Wells Fargo. Id., pp. 230-33. Wells Fargo's 2010 contract with MCS required MCS to "comply with all applicable international, federal, state and local laws (and all corresponding regulations/directives) in connection with its performance under this Agreement." Id., p. 207 (excerpt from 2010 Wells Fargo/MCS Agreement). The 2012 version of the Wells Fargo/MCS contract stated:

Adherence to Laws. Vendor represents and warrants that in carrying out its duties and responsibilities under this Master Agreement it will neither undertake, nor cause, nor permit to be undertaken, any activity which either (i) is illegal under applicable law or would have the material effect of causing Wells Fargo to be in violation of any laws, decrees, rules or regulations in effect in the United States as applicable to the Services provided under this Master Agreement, or (ii) is illegal under, or would have the material effect of Wells Fargo to be in violation of, any laws, decrees, rules or regulations in effect in any other country in which Vendor provides Services to Wells Fargo under this Master Agreement.

Id., p. 209 (excerpt from 2012 Wells Fargo/MCS Agreement).

7

Soppe testified that Wells Fargo relied on inspection results to determine if the Property was vacant or abandoned and did not provide any criteria to its vendors to determine occupancy.   Id., p. 234 (excerpt of 30(b)(6) deposition of Wells Fargo representative Chad Soppe).

On July 6, 2011, MCS inspected the Property and determined it was vacant based on a report from a neighbor that he had seen "a move out."  Id., p. 121 (MCS inspection detail report).   Njema returned from work on July 6, 2011, and saw a notice posted on the front door indicating that he should call MCS to verify occupancy of the Property.   Affidavit of Kenneth Njema ("Njema Aff."), ¶11 [Docket No. 197].   Njema called MCS and Wells Fargo that day to verify that he was living in the house.  Id.  Wells Fargo's notes on July 6, 2011, state "Primary Residence/Occupied."   Declaration of Jonathan L.R. Drewes ("Drewes Decl."), Ex. I (print out of Wells Fargo servicer notes) [Docket No. 198].   Nonetheless, five days later, on July 11, 2011, Wells Fargo ordered the Property secured because the Property was vacant, based on MCS's determination of July 6, 2011.  Id., Ex. J (printout of Wells Fargo servicer notes).

MCS returned to the Property on July 12, 2011, and changed the locks.  WF Appx., p. 130 (MCS "completion details" form).  MCS took photos of the Property, which showed some empty rooms, some furnished rooms, and food in the refrigerator and cabinets.  Id., pp. 132-136 (MCS inspection photos).  On July 13, 2011, Njema called Wells Fargo to tell them about the lockout, and the employee told Njema it was a mistake, it would never happen again, and promised to mail new keys to him via express shipping.  Njema Aff., ¶12.  On July 13, 2011, a Wells Fargo employee sent an email to Wells Fargo's Property Preservation Department, stating that the Property was

owner occupied and asking that keys be overnighted to Njema.   Second Drewes Declaration ("Second Drewes Decl."), Ex. A (email from Wells Fargo employee Latoya Swiams to Property Preservation Department) [Docket No. 218-1].   Swiams asked that the request be "escalate[d]."   Id.   The Property Preservation Department forwarded the message to MCS, asking MCS to "review and advise on this accordingly."   Id.   MCS replied that the keys would be sent out that day.   Id.   After being locked out, Njema spent one night in a motel and one night at a friend's house.   Wells Fargo Appx., pp. 254-256 (excerpt of Njema's deposition).

On October 12, 2011, MCS inspected the property and determined it was vacant; on November 7, 2011, MCS determined it was occupied.   Drewes Decl., Ex. H (MCS inspection log).   However, on the same day, Njema returned home and found that the locks had been changed, the water intake was shut off, the electricity was turned off, and a notice was posted indicating that the Property had been deemed vacant and abandoned.   Njema Aff., ¶14.

MCS inspected the Property on May 23, 2012, and determined the Property was vacant based on its visual inspection, the lack of personal property and no apparent activity.   WF Appx., pp. 139-42; Drewes Decl., Ex. H (MCS inspection log); Second Drewes Decl., Ex. C (MCS inspection report).

On June 2, 2012, two days after the sheriff's sale, Njema met an individual at the Property who identified himself as being with Wells Fargo and who stated that Wells Fargo had sent him to change the locks.   Njema Aff., ¶16.   The water intake was shut off and the electricity was turned off.   Id.   The individual asked Njema to allow him to post the notices indicating the Property was vacant and abandoned.   Id.   This person

told Njema he could take the notices down after he left and gave Njema a new key to use for the newly installed locks.  Id.  The photos taken on June 2, 2012, by MCS showed some empty rooms, food in the refrigerator and possessions in drawers.  WF Appx., pp. 149-154.  MCS noted that after they had changed the locks, Njema showed up.  Id., p. 149.

On June 25, 2012, MCS returned to the Property and deemed it vacant based on "lack of personal property."  Id., p. 155.  On July 15, 2012, MCS inspected the Property again, determined it was vacant and installed a new lock, shut off the water intake, turned off the electricity, and posted notices indicating the Property was vacant and abandoned.  Id., p. 166; Njema Aff., ¶17.  Njema stated that he called Wells Fargo on July 18, 2012, to complain about "the ongoing pattern of invasion of privacy and lock out despite my clear communication that [he] was living in the house;" according to Njema, the Wells Fargo employee "sent multiple Emails to different managerial people within Wells Fargo including the property preservation department director while [he] was on the phone."  Njema Aff., ¶18.

On October 14, 2012, Njema called Wells Fargo and stated that he intended to redeem the Property and to complain again of repeated entries onto the Property by MCS.  Id., ¶20.  Njema reported that he had spoken with an MCS representative and was told to call Wells Fargo.  Id.  Njema further reported telling Wells Fargo that if it was aware of MCS's intrusions then "perhaps MCS is unfit to conduct the inspections."  Id.

On December 6, 2012, Njema came home and found that the water intake was shut off, the electricity was turned off, and notices were posted indicating that the Property had been deemed vacant and abandoned.  Id., p. 21.

Throughout this period, Njema was in the process of trying to arrange a short sale of the Property.  WF Appx., pp. 69-77 (October, 2011 purchase agreement); pp. 89-96 (February, 2012 purchase agreement); pp. 104-111 (May, 2012 purchase agreement).

On March 2, 2013, a month after Njema commenced the instant lawsuit and in which he alleged trespass, among other claims, MCS again changed the locks, shut off the water intake, turned off the electricity, and posted notices indicating the property was vacant and abandoned.  Id., pp. 188-189 (MCS completion details form); Njema Aff., ¶23.  In addition, the water meter was dismantled so that the water could not be turned back on immediately without repair.  Njema Aff., ¶23.  The photos from this inspection showed piles of debris on the floor, personal possessions and missing appliances.  WF Appx., pp. 189-196.

On January 8, 2014, when Njema was present, without ringing the doorbell or knocking on the door, MCS entered the Property with copies of keys they had retained, brought a garbage container into the garage, and left.  Njema Aff., ¶24; Drewes Decl., Ex. H.

There is no dispute that Wells Fargo paid for MCS's services in connection with Njema's property.  Second Drewes Decl., Ex. B (listing of payments from Wells Fargo to MCS); Wells Fargo's Supplemental Reply Memorandum in Support of Motion for Summary Judgment ("Wells Fargo Suppl. Reply Mem."), p. 3 ("Wells Fargo has never denied that it paid MCS for its services, and the Court may assume for purposes of this motion that Wells Fargo did so.") [Docket No. 219].

Although MCS changed the locks on several occasions, Njema was actually only locked out of the property twice—in July, 2011, when he was forced to stay in a motel one night and spend one night with a friend, and on March 2, 2013, until the water meter was reconnected. Njema Aff., ¶¶12, 23. Otherwise, Njema had access to the house despite the lock changes. Njema Aff., ¶¶14, 16; WF Appx., p. 257 (deposition testimony of Njema).

Njema commenced this lawsuit in state court on February 14, 2013, by service of the summons and complaint on Wells Fargo. Complaint, Notice of Service of Process [Docket No. 1-1]. Wells Fargo removed the matter to Federal District Court under 28 U.S.C. §1332(a)(1) – diversity jurisdiction. Notice of Removal [Docket No. 1].

Njema's Complaint alleged the following claims against Wells Fargo:

Counts 1 and 4 alleged breach of contract based on Wells Fargo's failure to conduct a face-to-face meeting with Njema in violation of a requirement in the mortgage[1] that the mortgagee not initiate foreclosure proceedings without conducting this face-to-face interview. Complaint, ¶¶27-32, 49, 50. Count 2 alleged that Wells Fargo failed to mail a Notice of Pending Acquisition to Njema, as required by HUD

---

[1]    Pursuant to 24 C.F.R. § 203.604(b); a lender must "have a face-to-face interview with the borrower, or make a reasonable effort to arrange such a meeting, before three monthly installments due on the mortgage are unpaid" before foreclosing on a HUD-insured mortgage. Wells Fargo contended that this regulation provides no private right of action for violation of the face-to-face meeting requirement, but nonetheless stipulated for the purposes of this case only that it would not contest Njema's argument that the regulation is enforceable under a breach of contract theory, since the regulation is referenced in his mortgage. Wells Fargo's Memorandum in Support of Motion for Summary Judgment ("Def's Mem."), p. 13 [Docket No. 190]. Indeed, Wells Fargo had previously agreed to admit liability on Counts 1, 2, and 4, which related to its HUD-based obligations, but did not admit to any damages caused by its breach. Order dated March 4, 2014, pp. 2-3 [Docket No. 52].

regulations, 24 C.F.R. §203.675.[2]  Id., ¶¶34-36.   Njema alleged that if he had received this notice, he would have submitted a Request for Continued Occupancy to HUD, and HUD would have granted his request.   Id., ¶¶24, 35.   Count 3 alleged intentional misrepresentation based on Wells Fargo's representation to him that it would approve a short sale of the Property, but by failing to act with due diligence by approving the sale on or about May 23, 2012,[3] the prospective buyer cancelled the purchase agreement. Id., ¶39.   Njema also alleged that he relied on Wells Fargo's intentional misrepresentation to his detriment – that but for this misrepresentation he would not have spent substantial time and effort to sell the Property for $102,000 and would have explored alternatives to avoid foreclosure.   Id., ¶40.   In his second Count 3,[4] Njema alleged trespass based on the entry of Wells Fargo's agents (i.e. MCS) onto the Property and locking him out of the Property.   Id., ¶43.   According to Njema, these actions occurred at a time when Wells Fargo knew or should have known that Njema was living at the Property and was the lawful owner.   Id., ¶¶45, 46.

---

[2]     This HUD regulation states:

> At least 60 days, but not more than 90 days, before the date on which the mortgagee reasonably expects to acquire title to the property, the mortgagee shall notify the mortgagor and each head of household who is actually occupying a unit of the property of its potential acquisition by HUD. The mortgagee shall send a copy of this notification to the appropriate HUD Field Office.

24 C.F.R. § 203.675(a).

[3]     This Count relates to the third purchase offer of May 22, 2012.  WF Appx., pp. 104-111.

[4]     The Complaint has two Count 3s, apparently as a result of misnumbering the counts.

Count 5 alleged intentional infliction of emotional distress based on Wells Fargo's "extreme and outrageous conduct," including Wells Fargo's failure to make reasonable efforts to arrange a face-to-face meeting; failure to approve a short sale; failure to send a Notice of Pending Acquisition before beginning eviction proceedings; foreclosure even though a "bona fide sale was probable;" trespass on the Property to change locks, even before the expiration of the redemption period; and actions in trying to evict Njema even though the foreclosure was improper. Id., Id., ¶¶53-55.

## II.   LEGAL STANDARDS

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celeotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N.D. Iowa 1995) (quoting Anderson, 477 U.S. at 248). "[I]f the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted." DePugh, 880 F.Supp. at 656 (quoting Anderson, 477 U.S. at 248).

The moving party bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific

facts in the record that create a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 256;

<u>Krenik v. County of LeSueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).  "The nonmoving party

may not rest on mere allegations or denials, but must show through the presentation of

admissible evidence that specific facts exist creating a genuine issue for trial."

<u>Minnesota Laborers Health & Welfare Fund v. Swenke</u>, Civ. No. 02-992 (RHK/AJB),

2003 WL 21521755, at *1 (D. Minn. July 2, 2003).

    Summary judgment is appropriate where the material facts are not in dispute,

and the court need only apply the law to the facts in the record.  <u>See</u> <u>Eisenrich v.</u>

<u>Minneapolis Retail Meat Cutters</u>, 282 F. Supp. 1077, 1080-81 (D. Minn. 2003) (citing

<u>Oldham v. West</u>, 47 F.3d 985, 988 (8th Cir. 1995)).

## III.   DISCUSSION

### A.   <u>Breach of Contract – Counts 1, 2 and 4</u>

    As stated previously, the only issue remaining with respect to Counts 1, 2 and 4

is damages, as Wells Fargo already has admitted liability for its failure to conduct the

face-to-face meeting required by the mortgage, which required compliance with HUD

regulations.

    Counts 1 and 4 of the Complaint alleged that but for Wells Fargo's failure to hold

a face-to-face meeting with him, Njema could have avoided foreclosure.  Complaint,

¶¶30, 49, 50.  The facts before the Court indicate that Njema spoke with a Wells Fargo

representative over the phone regarding his options.  WF Appx., pp. 41-46 (transcript of

telephone call between Njema and Wells Fargo representative on March 11, 2011),

245-251 (excerpt of Njema's deposition).  Specifically, Njema testified that he spoke

with a Wells Fargo representative about a loan modification, providing a deed-in-lieu of

foreclosure, and a short sale.  Id., p. 246.  Njema believed that if he had met with a representative in person, other options would have been explored, although he could not identify what those options were.  Id., pp. 248-250.  Njema also testified that it was "a possibility" that a short sale would have succeeded if he had met with a representative in person.  Id., p. 250.

According to Wells Fargo, "speculation and conjecture are not enough to avoid summary judgment."  Def.'s Mem., p. 14 (citing Doe v. Department of Veterans Affairs of U.S., 519 F.3d 456, 460-61 (8th Cir. 2008)).  Wells Fargo contended that there was no evidence that a face-to-face meeting would have produced any outcome that would have allowed Njema to avoid foreclosure and as a result, Njema suffered no actual damages.

Njema responded that the foreclosure was "the breach and the harm."  Plaintiff's Memorandum in Response to Motion for Summary Judgment ("Pl.'s Resp."), p. 13. [Docket No. 196].  Njema maintained that 24 C.F.R. § 203.604, requiring the face-to-face meeting, was mandatory, and that by agreeing to comply with HUD regulations in the mortgage, Wells Fargo could not commence the foreclosure until it had complied with this condition precedent.  Id., pp. 14-15 (citing 24 C.F.R. § 203.500);[5] WF Appx., p. 7.  Additionally, Njema claimed that his damages were not speculative or conjectural;

---

[5]    24 C.F.R. § 203.500 is entitled "Mortgage servicing generally" and provides:

This subpart identifies servicing practices of lending institutions that HUD considers acceptable for mortgages insured by HUD. Failure to comply with this subpart shall not be a basis for denial of insurance benefits, but failure to comply will be cause for imposition of a civil money penalty, including a penalty under § 30.35(c)(2), or withdrawal of HUD's approval of a mortgagee. It is the intent of the Department that no mortgagee shall commence foreclosure or acquire title to a property until the requirements of this subpart have been followed.

the phone calls he had with Wells Fargo evidenced a borrower who did not understand his options; and at any rate, he would have qualified for the FHA-Home Affordable Mortgage Protection ("HAMP") loan modification program had the Wells Fargo representative accurately described the program when speaking to Njema on the phone. Id., pp. 15-17. Njema then provided his own calculations of his income and his sister's income to show that they would have qualified for a HAMP loan. Id., p. 16.

In reply, Wells Fargo reiterated that Njema's breach of contract claims failed because he could not show that the lack of the face-to-face meeting caused the foreclosure. Wells Fargo Reply Memorandum in Support of Summary Judgment ("Def.'s Reply"), p. 2 [Docket No. 199]. Further, any alternative to foreclosure – for example, short sale and deed-in-lieu of foreclosure – had been made available to Njema and explored. Id., pp. 2-3.

As for Njema's contention that he qualified for and should have received a HAMP loan modification, Wells Fargo responded that Njema had not sued Wells Fargo for wrongfully refusing to give a HAMP modification nor could he, as HAMP does not provide for a private cause of action, and he was ineligible for the HAMP program as he had defaulted under the previous modification. Def.'s Reply, p. 4 (citations omitted). Further, Njema's contention that he would have qualified for a modified loan with a monthly payment of $1,028.48, was belied by his deposition testimony that he could only afford a monthly payment of "around $700 per month." Id., p. 5 (citing WF Appx., p. 252).

Under Minnesota state law, Njema must prove the following elements to succeed on his breach of contract claim: (1) a contract was formed; (2) the plaintiff performed the

conditions precedent, and (3) the defendant breached the contract.  Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 833 (Minn. 2011); Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A., 756 N.W.2d 907, 918 (Minn. Ct. App. 2008), rev. denied (Minn. Jan. 20, 2009); Border State Bank of Greenbush v. Bagley Livestock Exchange, Inc., 690 N.W.2d 326, 335–36 (Minn. Ct. App. 2004), rev. denied (Minn. Feb. 23, 2005).

Additionally, "[a] breach of contract claim fails as a matter of law if the plaintiff cannot establish that he or she has been damaged by the alleged breach." Jensen v. Duluth Area YMCA, 688 N.W.2d 574, 578-79 (Minn. Ct. App. 2004); Hot Stuff Food, LLC v. Dornbach, 726 F.Supp.2d 1038, 1042 (D. Minn. 2010) ("To establish a breach of contract claim under Minnesota law [plaintiff[] must show formation of a contract, performance of any conditions precedent . . ., a material breach . . . and damages.") (citing MSK EyEs Lted. V. Wells Fargo Bank, N.A., 546 F.3d 533, 540 (8th Cir. 2008) (plaintiffs must show "(1) formation of a contract; (2) performance by [plaintiffs] of any conditions precedent; (3) material breach of the contract by [defendant]; and (4) damages")).  Therefore, summary judgment is appropriate if a plaintiff cannot prove damages caused by the defendant. Reuter v. Jax Ltd., Inc. 711 F.3d 918, 920 (8th Cir. 2013) (affirming district court's grant of summary judgment on breach of contract claim because plaintiff did not allege damages) (citing Jensen, 688 N.W.2d at 578-79); Gauff v. Wimbley, Civ. No. 9-3423 (MJD/JJG), 2011 WL 1363981, at *5 (D. Minn. Apr. 11, 2011) (granting summary judgment on breach of contract claim because there was no evidence of damages to plaintiffs caused by defendants).

Njema's argument that the foreclosure "is the harm" because it damaged his property rights, (Pl.'s Mem., p. 13), is rejected.  There is no evidence that Wells Fargo's

failure to conduct a face-to-face meeting with Njema <u>caused</u> the foreclosure.  To the contrary, the overwhelming evidence was that the foreclosure was due to the Njemas' default on their already-modified mortgage loan, and failure to complete a short sale of the home within the parameters established by HUD and Wells Fargo.  The Court also rejects as completely speculative and, frankly, irrelevant, Njema's argument that if the face-to-face meeting had occurred he would have received a HAMP modification and avoided foreclosure.  <u>See</u> <u>Beaulieu v. Ludeman</u>, 690 F.3d 1017, 1024 (8th Cir. 2012) ("[S]peculation and conjecture are insufficient to defeat summary judgment.").  As Wells Fargo correctly explained, Njema was not qualified for the HAMP program because he had already defaulted under a previous loan modification and even if he was not precluded by this previous default from pursuing a HAMP modification, his own testimony was that he could not afford the $1028.50 payment resulting from participation in the HAMP program.

As for Count 2 of the Complaint, in which Njema alleged that Wells Fargo's failure to send him a Notice of Pending Acquisition caused him damage, Wells Fargo generally maintained that Njema suffered no damages flowing from its conduct.  Def.'s Mem., p. 12.  Njema did not respond to this statement and, therefore, waived any argument that he incurred damages in connection Count 2.  <u>Salaimeh v. Messerli & Kramer, P.A.</u>, Civ. No. 13-3201 (DSD/HB), 2014 WL 6684970, at *2, n. 2 (D. Minn. Nov. 25, 2014) (noting that plaintiff did not address certain issues raised by defendant in her opposition to summary judgment and stating "[a]lthough this court considers those claims, it notes that they have been effectively waived.") (citing <u>Satcher v. University of Ark. at Pine Bluff Bd. Of Trs.</u>, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a

basis for summary judgment constitutes waiver of that argument.")). At any rate, Njema's assertion in the Complaint that if he had received the Notice he would have submitted a Request for Continued Occupancy to HUD and HUD would have granted the request, like his claim for damages bearing on his face-to-face breach of contract theory, is speculative and completely unsupported by any evidence.

For these reasons, the Court recommends dismissing Counts 1, 2, and 4 of the Complaint.

**B.    Intentional Misrepresentation – Count 3**

Njema asserted that Wells Fargo represented that it would enter into a short sale for a purchase price of $102,000, but did not act with due diligence in approving the May 22, 2012, purchase offer. Complaint, ¶39.

Wells Fargo contended that this claim failed as a matter of law for three reasons: the alleged misrepresentation was true; Njema's claim that it did not act with due diligence regarding the purchase offer was not a representation of fact; and even if a failure to act with due diligence amounted to fraud, the undisputed evidence established it acted with diligence. Def.'s Mem., pp. 17-19.

In response, Njema maintained that the actionable misrepresentation was contained in Wells Fargo's approval letter of the first offer, which included allowances for delinquent homeowners' association dues and an outstanding utility/water bill. Pl.'s Mem., p. 18.[6]  Wells Fargo replied that Njema's argument was unsupported by the

---

[6]    Njema's response is one paragraph long and did not address his "due diligence" claim with respect to the May, 2012 purchase offer, which is the only offer referenced in Count 3. Thus, it is deemed waived. <u>Salaimeh</u>, 2014 WL 6684970, at *2, n. 2. In any event, lack of due diligence is not an element of intentional misrepresentation, and there

record.  Def.'s Reply, pp. 6-7.  While Wells Fargo had agreed to cover a certain amount of the homeowners' association dues and an outstanding water bill, the Njemas owed more than the sums Wells Fargo had agreed to cover at the closing, and they could not come up with the balance.  Id. (citing WF Appx., pp. 84-87; WF Suppl. Appx., pp. 287-02).  Moreover, even if Wells Fargo had reneged on its agreement, this conduct amounts to breach of contract and not fraud.  Id. (citing Northwest Airlines, Inc. v. Astraea Aviation Services, Inc., 111 F.3d 1386, 1393 (8th Cir. 1997) ("Broken promises generally do not constitute fraud . . . unless the plaintiff shows 'affirmative evidence' that the promisor had no intention to perform.") (citation omitted)).

> To survive summary judgment on a common law fraud/intentional misrepresentation claim, the evidence must demonstrate that (1) Defendants made a false representation about a past or present material fact that was susceptible of knowledge; (2) Defendants knew the representation was false or asserted it as its own knowledge without knowing whether it was true or false; (3) Defendants intended to induce Plaintiffs to act and that Plaintiffs were induced to act; and (4) that Plaintiffs acted in reliance on the representation and were damaged.

Marchetti v. U.S. Bank, N.A., Civ. No. 13-1978 (PJS/LIB), 2015 WL 1038382, at *8 (D. Minn. Mar. 10, 2015) (citing Bartol v. ACC Capital Holding Corp., No. 09–cv–2718 (DWF/JSM), 2010 WL 156448, at *3 (D. Minn. Jan. 11, 2010) (citing M.H. v. Caritas Family Servs., 488 N.W.2d 282, 289 (Minn.1992)).

The first misrepresentation alleged by Njema in his response (but not in his Complaint) – that Wells Fargo[7] would approve a short sale for $102,000 – was not a

---

is no evidence that Wells Fargo failed to act diligently in connection with the May 22, 2012, purchase offer.

[7]    HUD, not Wells Fargo, set the terms and conditions for the sale.  WF Appx., pp. 64-68.

misrepresentation. Wells Fargo did, in fact, approve the November, 2011, short sale for $102,000. WF Appx., pp. 78-80 (approval letter from Wells Fargo). However, when the Njemas were unable to satisfy the amount outstanding to the homeowner's association, which was an amount over and above that which Wells Fargo had agreed to contribute, the prospective buyers moved on. The second purchase offer of $90,000 fell through when the prospective buyer rejected Njema's counteroffer of $102,000 and HUD would not grant a variance from its $102,000 purchase price. Id., pp. 97-100 (email chain from Wells Fargo representative to Tom Hrastich stating "I'm sorry but HUD denied the variance so I will need to deny the offer."). The third offer, which is the offer specifically referenced in the Complaint, fell through when the Njemas did not produce the updated financial information Wells Fargo sought. WF Appx., p. 117 (HUD Sales Contract Review form stating that the May 22, 2012 offer was rejected because "documents needed for review not received."). Njema did not dispute any of these facts in his responses to Wells Fargo's summary judgment motion.

On this record, the Court concludes that Wells Fargo made no false or fraudulent misrepresentations, and therefore, this claim cannot survive the motion for summary judgment.

### C. Trespass – Second Count 3

Njema's mortgage authorized Wells Fargo to "inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned property." WF Appx. pp. 5-6. Likewise, because the Property was insured by HUD, Wells Fargo was required by law to preserve and protect property that has been deemed abandoned, after attempting to

reach the mortgagor. Def.'s Mem. in Support, pp. 21-22; 24 C.F.R. § 203.377. According to Wells Fargo, "when a mortgage is in default and efforts to reach the mortgagor are unsuccessful" then the mortgagee:

> Shall be responsible for a visual inspection of the security property to determine whether the property is vacant. The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary.

Id. (citing 24 C.F.R. § 203.377).

Wells Fargo contended that because the Njemas' loan was in default, it had a contractual right to enter the Property and as a result, its entry was not wrongful and did not constitute trespass. Id., pp. 20-21. Wells Fargo further submitted that it was undisputed that each time MCS entered the Property, it reasonably determined the Property was vacant, and therefore, the entries were lawful. Id., p. 21. According to Wells Fargo, no reasonable jury could conclude that MCS's actions were beyond the consent granted in the mortgage to enter and secure the Property if it was deemed vacant or abandoned. Id., p. 23. Based on the physical evidence – rooms empty of furniture, messy piles of clothing, appliances missing – MCS reasonably determined that the Property was abandoned. Id., p. 24.

Additionally, Wells Fargo argued that even if the entry onto the Property by MCS constituted trespass, Wells Fargo could not be held liable for MCS's actions, because it did not control MCS's actions, did not tell MCS what criteria to use in determining if the Property was vacant, and specifically directed MCS not to transgress the law. Id., pp. 25, 27 (citing WF Appx., pp. 207 (excerpt from 2010 Wells Fargo/MCS contract), 209 (excerpt from 2012 Wells Fargo/MCS contract)). In short, because it did not control

23

MCS's work, and specifically directed MCS not to transgress the law, Wells Fargo maintained that it could not be held responsible for MCS's actions. Id., pp. 26-27.

In response, Njema agreed that Wells Fargo had the right to visually inspect the Property once he defaulted on his loan. Pl.'s Resp., p. 19. Nevertheless, despite the fact that he repeatedly informed Wells Fargo that he was occupying the Property, Wells Fargo authorized MCS's lockouts. Id., pp. 19-20. According to Njema, Wells Fargo was conflating two independent legal rights under the mortgage – the right to inspect the Property following default, and the right to take reasonable steps to secure the Property if deemed vacant or abandoned. Id., p. 20. Because the Property was not vacant, and Wells Fargo knew the Property was not vacant, MCS did not have the right to enter the Property and change the locks. Id. Njema further submitted that because he was negotiating with Wells Fargo for a short sale of the Property, any determination that the Property was vacant was unreasonable. Id., p. 21.

As for Wells Fargo's argument that it could not be held responsible for any trespass by MCS, Njema submitted that by continuing to contract with and permitting MCS to enter his Property even after learning that Njema was living there, Wells Fargo had ratified MCS's actions.[8] Id., p. 24.

Well Fargo replied that "all MCS had to go on" in deciding if the Property was vacant was "objective outward evidence" as it could not know what Njema's subjective

---

[8]    In the alternative, Njema argued that summary judgment on his trespass claim should be denied because Wells Fargo had not yet produced documents related to the lockouts. Pl.'s Resp., p. 25. The Court addressed this alternative argument by ordering more discovery on the trespass claim and by allowing the parties to submit supplemental briefs regarding the trespass claim. See Order dated March 19, 2015 [Docket No. 206]; Order dated April 7, 2015 [Docket No. 208]; Order dated May 11, 2015 [Docket No. 216].

intentions were at any given time.  Def.'s Reply, p. 11.  As to its ratification of MCS's actions, Wells Fargo asserted that ratification requires full knowledge of all material facts of an unauthorized act.  Id., p. 13 (citing Anderson v. First Nat'l Bank of Pine City, 228 N.W.2d 257, 259 (Minn. 1975)).  Here, even assuming MCS's conduct was tortious, there was no evidence that Wells Fargo knowingly ratified such conduct.  Id.  Each time MCS changed the locks, it reported the Property abandoned and took photos "objectively consistent with a property that has been abandoned," therefore, there was no evidence that Wells Fargo knew or had reason to know that MCS was lying.  Id., p. 14.

In his supplemental memorandum, Njema again pointed to evidence that he told Wells Fargo repeatedly that he was occupying the Property, but Wells Fargo continued to direct and pay MCS for lockouts it knew were wrongful and constituted erroneous vacancy determinations.  Plaintiff's Supplemental Memorandum of Law in Opposition to Summary Judgment ("Pl.'s Suppl. Mem."), pp. 1-7 [Docket No. 217] (citing Drewes Decl., Exs. C, D, I; Njema Aff., ¶¶12, 16, 18, 23; Second Drewes Decl., Ex. J ). According to Njema, Wells Fargo was fully apprised of MCS's inspections and entries onto the Property at the same time it knew that Njema was attempting a short sale, and had heard from Njema directly that he was occupying the Property, yet Wells Fargo failed to reign in MCS and ordered lockouts based on MCS's assessments.  Id., pp. 8-9. Njema also submitted that despite knowing of MCS's wrongful lockouts, Wells Fargo did nothing to repudiate MCS's conduct and continued to pay MCS, thus ratifying MCS's actions.  Id., p. 11.  For example, based on its communications with Njema, Wells Fargo

knew that Njema was occupying the Property, but did not communicate with MCS after Njema called on July 18, 2012, to complain about the repetitive lockouts. Id.. p. 13.

In response to Njema's supplemental arguments, Wells Fargo asserted that its only knowledge of whether the Property was occupied came from MCS's reports, and MCS had supported its vacancy determinations with evidence, such as the lack of personal property, a report from a neighbor who saw a move-out and the like. Wells Fargo Supplemental Reply Memorandum in Support of Summary Judgment, pp. 5-6 [Docket No. 219]. Moreover, the fact that Njema told Wells Fargo in July, 2011, that he was occupying the Property, did not mean that he was living in the Property during the later inspections and lockouts. Id., p. 7. Further, the fact that Njema was negotiating a short sale during this period did not prove that Wells Fargo knew he was living in the Property, as there is no requirement that a property be occupied during the short sale process. Id. A borrower can truthfully report occupying property one day, and move out the next. Id. According to Wells Fargo, Njema failed to establish that Wells Fargo knew that MCS was trespassing and even if it did, he had no evidence that Wells Fargo ratified MCS's conduct because ratification requires knowledge that an act was wrongful, and Wells Fargo did not know MCS was trespassing. Id., pp. 11-12.

Under Minnesota law, "a trespass is committed where a plaintiff has the right of possession to the land at issue and there is a wrongful and unlawful entry upon such possession by defendant." Johnson v. Paynesville Farmers Union Coop. Oil Co., 817 N.W.2d 693, 701 (Minn. 2012) (citations and internal quotation marks omitted). Minnesota's trespass jurisprudence "recognizes the unconditional right of property owners to exclude others through the ability to maintain an action in trespass even

when no damages are provable." Id. at 704. Intent is required for trespass liability. Id. at 701 ("[T]he tort of trespass is committed when a person intentionally enters or causes direct and tangible entry upon the land in possession of another." (citation and internal quotation marks omitted)).

Additionally, under Minnesota law, "[t]o establish a claim of ratification, a plaintiff must prove that a defendant, 'having full knowledge of all the material facts, confirm[ed], approve[d], or sanction[ed], by affirmative act or acquiescence, the originally unauthorized act of another, thereby creating an agency relationship and binding the principal by the act of his agent as though that act had been done with prior authority.'" Wildung v. Bank of New York Mellon, Civ. No. A13–1530, 2014 WL 1758305, at *2 (Minn. Ct. App. May 5, 2014) (quoting Anderson v. First Nat'l Bank of Pine City, 303 Minn. 408, 410, 228 N.W.2d 257, 259 (1975)); Securian Fin. Grp., Inc. v. Wells Fargo Bank, N.A., Civ. No. 11-2956 (DWF/HB), 2014 WL 6911100, at *13 (D. Minn. Dec. 8, 2014) (ratification occurs when a party with "full knowledge of the material facts, confirmed, approved, or sanctioned by affirmative act or acquiescence, the originally unauthorized act of another.") (citations omitted).

There is no dispute that MCS was acting at Wells Fargo's behest. Wells Fargo contracted with MCS and paid MCS for its work. It is also undisputed that Wells Fargo received MCS's inspection reports and thus knew of MCS's activities on the Property; Wells Fargo never took any actions to curtail MCS's activities; and Wells Fargo never contacted Njema to determine if he was living at the Property or directed MCS to contact Njema before entering the Property. What is factually in dispute is whether MCS's actions were unlawful, and whether Wells Fargo ratified MCS's actions.

Consequently, the Court concludes that genuine issues of material fact preclude summary judgment on Njema's trespass claim based on the following facts.

On July 6, 2011, after Njema was locked out of his house by MCS, as instructed by the notice posted by MCS, Njema called both MCS and Wells Fargo the same day to tell them both that he was living in the Property. Drewes Decl., Ex. I. Nevertheless, on July 12, 2011, based on Wells Fargo's directive on July 11, 2011, MCS returned to the Property and changed the locks, despite Njema's phone call to Wells Fargo five days earlier informing it that he lived there, and photos taken that day that showed some furnished rooms, and food in the refrigerator and cabinets. Drewes Decl., Exs. I, J; Wells Fargo Appx., pp. 132-136 (MCS inspection photos). On July 13, 2011, Njema called Wells Fargo regarding the lockout and a Wells Fargo employee told him that it was a mistake, it would never happen again, and keys would be express shipped to him. Njema Aff., ¶12. Wells Fargo employee Swiams then sent an email to Wells Fargo's Property Preservation Department informing it that Njema was living in the Property and he needed a set of keys. Second Drewes Decl., Ex. A (email from Latoya Swiams to Property Preservation Department). The Property Preservation Department forwarded the message to MCS, asking MCS to "please review and advise," and MCS responded that it would send the keys to Njema the next day. Id.

On November 7, 2011, MCS determined the property was occupied, yet the same day, Njema returned home and found that MCS had performed another lockout. Drewes Decl., Ex. H (MCS inspection log); Njema Aff., ¶14.

Based on a visual inspection on May 23, 2012 of some empty rooms, food in the refrigerator and possessions in drawers, on June 2, 2012, an MCS representative was

changing the locks when Njema arrived home.  Suppl Drewes Decl., Ex. J.  That person told Njema that he worked for Wells Fargo and was changing the locks to lock Njema out of the Property.  Njema Aff., ¶16.  This person verified that Njema was the owner, but still proceeded to change the locks, ask Njema for permission to post notices that the Property was deemed vacant and abandoned, and inform Njema that he could take the notices down after he left.  Id.

On July 15, 2012, MCS installed another lockset.  Suppl Drewes Decl., Ex. J. Three days later, on July 18, 2012, Njema called Wells Fargo to say that he was living in the house.  Njema Aff., ¶18.  To try to stop MCS's intrusions onto the Property, this person sent emails to "different managerial people" within Wells Fargo, including the Property Preservation Department, while Njema was on the phone.  Id.

On March 2, 2013, after Njema had sued Wells Fargo alleging trespass, MCS again deemed the Property vacant and rekeyed the locks to the house.  Supp. Drewes Aff., Ex. N.

Much of these activities took place while Njema was in negotiations with Wells Fargo to arrange for a short sale of the Property.  Wells Fargo Appx., pp. 69-77, 89-96, 104-111.  Further, Wells Fargo paid for all of MCS's activities, including the lockout that took place after Njema sued Wells Fargo and sued for trespass, and took no actions to repudiate MCS's entries or lockouts or to instruct MCS to cease its actions.[9]  Drewes Decl., Ex. H.

---

[9]     Although not cited by either party, at a motion hearing on May 7, 2014, this Court asked Wells Fargo's counsel about the inspections by MCS even after the suit was commenced, and to clarify whether such inspections were continuing.  Counsel responded that Wells Fargo had asked MCS that the inspections not take place, but she could not recall if Wells Fargo had ever directed MCS in writing to stop the inspections.

On this record, the Court cannot conclude as a matter of law that MCS's actions were lawful, that Wells Fargo had no knowledge that Njema occupied the Property at the very time it was instructing MCS to inspect and secure the Property on its behalf, and that Wells Fargo had not ratified MCS's actions.

The case cited by Wells Fargo, Fireman's Fund Mortg. Corp., v. Zollicoffer, 719 F. Supp. 650 (N.D. Ill. 1989), does not support its position. Def.'s Mem., pp. 23-24. The court in Fireman's Fund Mortg.Corp. granted summary judgment to a lender on a homeowner's claim of trespass based on the following facts: when the lender secured the homeowner's premises, the homeowners were in default and the property inspectors noted that the telephone and electrical utilities had been disconnected, a ground level window was broken, the yard was unkempt, several other windows were unlocked and a neighbor reported that the property had been vacant for some time. Id. at 654, 658. Before ordering the property secured, a loan counselor called the homeowners and found that the phone was disconnected and there were no alternate numbers. Id. at 654. She then sent a certified letter telling the homeowners that the property would be secured within five days because it appeared vacant. Id. Not having heard from the homeowners, the lender sent an agent to secure the property. Id. The homeowner was actually at or near the premises when it was being secured, but did not tell the agents he was living in the home and continued to do nothing for two weeks, at

---

Counsel stated she would contact MCS in writing that day. Wells Fargo's counsel further noted that the "problem" was that the system of inspections was automated and once a property was entered into the database, inspections were triggered automatically. Counsel did admit that in January, 2014, MCS went to the Property to "fix" a perceived violation of the homeowners' association code following a complaint. Additionally, in connection with the motion being heard on May 7, 2014, Njema submitted an email directed to his then-counsel dated February 18, 2014, in which he stated that there had been a trespass "as recent as of last week." [Docket No. 68-1].

which time he left a voice mail message saying that the home was not vacant.  Id.  The

loan counselor immediately called the number left on her voice mail and also called the

homeowner's place of employment and left a message.   Id.   A follow-up inspection

confirmed the residence was vacant and the loan counselor left another message at the

homeowner's place of employment.  Id.  A few days later the homeowner called the loan

counselor, but when the counselor put him on hold to talk to a supervisor about a

workout, he hung up before she could return to the phone.  Id. at 655.  On these facts,

the court concluded:

> [T]he issue is the reasonableness of FFMC's belief that the
> Premises were abandoned, not the actual status of the
> Premises.  Thus, the inspection company report, upon which
> in part FFMC based its conclusion that the Premises were
> abandoned, though unverified, is properly part of the record
> which demonstrates that FFMC's actions were reasonable.
> FFMC did all that they could reasonably be required to do to
> determine the status of the Premises.   No reasonable jury
> could conclude otherwise.  Moreover, even absent the
> information FFMC received from the inspection company,
> FFMC's actions were reasonable. After not receiving four
> mortgage payments, FFMC repeatedly attempted to contact
> the Zollicoffers, calling them and sending letters to warn
> them of the ramifications of their default and of FFMC's
> intention to secure the Premises based on its belief that they
> were abandoned. The Zollicoffers acknowledged receipt of
> these letters only after the Premises were secured. The
> Zollicoffers' inability, or possibly refusal, to accept the
> certified letters only reinforced FFMC's reasonable belief that
> the Premises had been abandoned. More importantly, it is
> also undisputed that Mondell Zollicoffer was present at or
> near the Premises at the time FFMC's agents were securing
> the Premises.  He observed them securing the Premises, yet
> did nothing to stop them, such as simply informing them that
> the Premises were not abandoned. He apparently just
> walked away. This undisputed fact alone entitles FFMC to
> summary judgment on the Counterclaims.

***

> FFMC made the reasonable inquiries it was required to make by HUD regulations. FFMC's impression that the Premises were abandoned was largely due to the Zollicoffer's conduct. <u>By not accepting FFMC's letters and by not stopping FFMC from securing the Premises even though he was present</u>, Mondell Zollicoffer effectively consented to FFMC securing the Premises. The Zollicoffers are now estopped to assert causes of action based upon conduct by FFMC which, due to an existing contractual relationship and regulatory obligations, the Zollicoffers knew FFMC was required to undertake and to which the Zollicoffers did not object at the time.

<u>Id.</u> at 658 (emphasis added).

Here, in spite of Wells Fargo being told on several occasions by Njema that he was occupying the Property, and at the same time as he was negotiating with Wells Fargo to effectuate a short sale, MCS kept entering and securing the Property with Wells Fargo's knowledge. While it is true that in the photos taken by MCS and provided to Wells Fargo, appliances appear to be missing from the kitchen in one set of photographs, other photographs show there is food in the refrigerator, personal possessions in drawers, and a furnished bedroom. These observations by MCS, which were provided to Wells Fargo, coupled with Njema's repeated calls to inform Wells Fargo that he was living in the house, place into dispute the reasonableness of MCS's vacancy determinations, (and consequently, whether it was lawful for it to enter the Property to secure it), and whether Wells Fargo was on notice that MCS was entering occupied property. Further, unlike lender in <u>Fireman's Fund Mortg. Corp.</u>, there is no evidence that Wells Fargo or MCS made any effort to contact Njema to determine if he was living there as required by 24 C.F.R § 203.377, before requesting MCS enter or rekey the Property. In fact, Wells Fargo admitted that the relevant HUD regulations authorizing it to protect and preserve property deemed vacant or abandoned come into

play "when a mortgage is in default and <u>efforts to reach the mortgagor are</u> <u>unsuccessful</u>."  Def's Mem., p. 21 (emphasis added).

In light of the evidence that supports a finding that MCS was wrong 100% of the time when it determined that the Property was vacant,[10] and Wells Fargo was aware on several occasions of MCS's erroneous determinations but did nothing to intervene or disavow MCS's actions, a reasonable jury could conclude that Wells Fargo ratified MCS's conduct.

In sum, despite Wells Fargo's insistence that it MCS's conduct was not unlawful, and that it never ratified any unlawful entries by MCS on to the Property, there is a factual dispute as to the lawfulness of MCS's conduct, Wells Fargo's knowledge of MCS's conduct, and whether payment of MCS's bills and failure to instruct MCS to stop, amounted to affirmance and acquiescence of MCS's actions.  For all of these reasons, the Court concludes that there are genuine issues of material fact precluding summary judgment on Njema's trespass claim.

**D.    <u>Intentional Infliction of Emotional Distress–Count 5</u>**

Wells Fargo asserted that Njema's claim for intentional infliction of emotional distress fails due to lack of sufficient evidence to support the elements of the claim. Def.'s Mem., pp. 28-29.  Specifically, Njema has produced no evidence that what Wells Fargo did was intentional and utterly intolerable, or that he suffered the severity of emotional distress required to make out such a claim.  <u>Id.</u>  In opposition, Njema asserted that Wells Fargo's actions were outrageous in that they constituted "assault" on his home, "a place which nearly every society on Earth values to the point of

---

[10]    MCS determined the Property was vacant 11 times.  Drewes Decl., Ex. H.

sacredness and which many people will go into decades of debt to secure." Pl.'s. Resp., p. 28. Njema did not point to any objective evidence that he suffered from severe emotional distress. Id., pp. 27-30. Rather, Njema merely argued that a jury could plausibly find that Wells Fargo inflicted severe emotional distress on him because "subjective, fact-intensive questions" are reserved for the jury. Id., pp. 29-30.

In reply, Wells Fargo argued that its conduct was not extreme and outrageous, because it was required to preserve the Property and hired MCS to determine when the Property was in need of securing, and relied on MCS's determinations. Def.'s Reply, p. 16. As to the severity of the alleged distress, Wells Fargo pointed out that Njema had failed to point to any evidence that "no reasonable person could be expected to endure" what Njema had experienced. Id., p. 17. According to Wells Fargo, summary judgment is not precluded merely because an issue may be fact intensive if a plaintiff presents insufficient evidence to support his claim. Id. (citing Trierweiler v. Wells Fargo Bank, 639 F.3d 456, 459 (8th Cir. 2011)). Moreover, although Njema claimed in his affidavit that he was fearful, sleepless, feared being intruded on and the like, his self-serving affidavit was not sufficient to defeat summary judgment. Id., pp. 17-18. Even assuming the truth of Njema's statements, Wells Fargo contended that his symptoms of distress failed to satisfy the criteria for severe emotional distress. Id., pp. 18-19.

Claims for intentional infliction of emotional distress are disfavored under Minnesota law. Mrozka v. Archdiocese of St. Paul & Minneapolis, 482 N.W.2d 806, 813-814 (Minn. Ct. App. 1992). To prevail on a claim of intentional infliction of emotional distress a plaintiff must establish: (1) the conduct is extreme and outrageous; (2) the conduct that is intentional or reckless; (3) the conduct caused emotional distress;

and (4) the distress must be severe.  Hubbard v. United Press Int'l, Inc., 330 N.W.2d
428, 438–39 (Minn. 1983) (citing Restatement (Second) of Torts § 46(1) (1965)).
"Extreme and outrageous" conduct must be "so atrocious that it passes the boundaries
of decency and is utterly intolerable to the civilized community."  Id. at 439.  "A
complainant must sustain a similarly heavy burden of production in his allegations
regarding the severity of his mental distress.  Expounding the meaning of 'severe
emotional distress,' the Restatement commentary says in part that '[t]he law intervenes
only where the distress inflicted is so severe that no reasonable man could be expected
to endure it.'"  Id. (citation omitted).  Moreover, a plaintiff must show that the defendant
"intend[ed] to cause severe emotional distress or proceed[ed] with the knowledge that it
is substantially certain, or at least highly probable, that severe emotional distress will
occur."  K.A.C. v. Benson, 527 N.W.2d 553, 560 (Minn. 1995) (citation omitted).

The Court finds that summary judgment on the intentional infliction of emotional
distress claim should be granted.  First, no reasonable juror could conclude that Wells
Fargo's conduct toward Njema was extreme and outrageous.  For the reasons
described above, Wells Fargo did not fail to approve a short sale – Njema's conduct
scuttled the first and third purchase offers and HUD would not approve the variance in
the purchase price on the second offer.  There is no evidence that Njema was harmed
by Wells Fargo's failure to hold a face-to-face meeting or to send a Notice of Pending
Acquisition.  As to the alleged trespasses, while the Court has concluded that genuine
issues of material fact preclude summary judgment on whether Wells Fargo is liable for
trespass, there is no evidence that the actions alleged to have been taken by Wells
Fargo (or MCS) rose to the level of being extreme or outrageous.  See Hays v.

35

CitiMortgage, Inc., Civ. No. 11-2477 (JRT/LIB), 2012 WL 1319413, at *10-11 (D. Minn. Mar. 29, 2012), Report and Recommendation adopted by 2012 WL 1314105, (dismissing plaintiff's intentional infliction of emotional distress claim against lender based on lender's actions in entering her property and changing the locks on property following foreclosure, noting that the conduct was not extreme or outrageous) (citing Bahr v. County of Martin, 771 F.Supp. 970, 978 (D. Minn. 1991) (granting summary judgment on plaintiff's intentional infliction of emotional distress claim, finding that defendants' actions in repossessing real and personal property did not amount to extreme and outrageous conduct)); R. S. ex rel. S.S. v. Minnewaska Area Sch. Dist. No. 2149, 894 F.Supp.2d 1128, 1147-1148 (D. Minn. 2012) (dismissing with prejudice plaintiff's intentional infliction of emotional distress claim, finding that defendant's actions in forcing a student to disclose her Facebook and email passwords and search of her private Facebook account, which plaintiff stated made her cry, "depressed, angry and scared, and embarrassed," to feel "less safe" and deprived her of her "sense of security," while "arguably callous, intrusive and an insensitive abuse of power" was not so "utterly intolerable" as to support an IIED claim); Allen v. Bank of Amer. Corp., Civ. No. 10-4205 (MJD/JSM), 2011 WL 3837150, at *8 (D. Minn. July 22, 2011) (allegations that defendant's conduct in connection with mortgage foreclosure resulted in plaintiff being threatened with incarceration, his driver's license revoked as a result of his inability to pay child support, inability to market his non-profit corporation and defendant's conduct caused his immune system to break down insufficient to state a claim for intentional infliction of emotional distress), Report and Recommendation adopted by 2011 WL 3837139 (D. Minn. Aug. 26, 2011); Minch Family Ltd. Partnership

v. Buffalo–Red River Watershed Dist., Nos. A06–850, A06–1194, 2007 WL 93084 at *5

(Minn. Ct. App. Jan. 16, 2007) (affirming district court's dismissal on summary judgment

of emotional distress claim where the defendants humiliated the plaintiff at public

meetings and encouraged others to do so, inconsistently enforced watershed-district

rules to his detriment, and treated him as an outsider); Strauss v.. Thorne, 490 N.W.2d

908, 913 (Minn. Ct. App.1992), rev. denied (Minn. Dec. 15, 1992) (concluding that it was

not "extreme and outrageous" conduct for the doctor of a patient's spouse to tell the

children's pediatrician about possible child abuse by the spouse in order to "get back" at

her.).  But see Wenigar v. Johnson, 712 N.W.2d 190, 197, 198, 207-208 (Minn. Ct. App.

2006) (affirming district court's decision that appellant's conduct was "extreme and

outrageous" under the standards for intentional infliction of emotional distress where

appellant teased and taunted respondent, who was cognitively disabled; forced him to

work without pay; forced him to work from 3:00 a.m. to 11:00 p.m. without breaks; did

not allow him to sleep through the night; provided uninhabitable living quarters without

light, heat or refrigeration; told others that respondent was "stupid and retarded" making

respondent fearful that if he quit, he would not find other employment; calling

respondent "stupid," "idiot," and often telling him that he came from a "retarded or stupid

family.")

Second, the evidence before this Court does not support a claim that Njema

suffered the severity of harm contemplated by an intentional infliction of emotional

distress claim.  Njema stated that he was "ridden and filled with anxiety;" had "dreaded

thoughts" at the thought of finding notices posted on his door; was "unnerved" and had

"anxiety and fear" as a result of the notices and MCS's inspection activities; and had

extreme anxiety, sleeplessness and "fear of being intruded upon or being arbitrarily locked out." Njema Aff., ¶¶25, 26. Njema's claims regarding these symptoms were unsubstantiated by any objective evidence. "Naked assertions, unsubstantiated by the record" made in rebuttal do not amount to evidence sufficient to preclude summary judgment. Dutton v. University Healthcare Sys., LLC, 136 Fed. App'x 596 (5th Cir. 2005) (unpublished decision). "A properly supported motion for summary judgment is not defeated by self-serving affidavits." Frevert v. Ford. Motor Co., 614 F.3d 466, 473 (8th Cir. 2010) (quoting Bacon v. Hennepin County Med. Ctr., 550 F.3d 711, 716 (8th Cir. 2008)). "Rather, the [nonmoving party] must substantiate allegations with sufficient probative evidence that would permit a finding in the [nonmoving party's] favor." Id. at 473–74; see also Oprenchak v. American Family Mut. Ins. Co., Civ. No. 12-1276 (DSD/JSM), 2013 WL 5918807, at *6 (D. Minn. Nov. 4, 2013) (plaintiff's failure to submit any medical records or other evidence to show that he suffered severe emotional distress resulted in summary judgment for defendant on this claim).

Moreover, while Njema's mental health records show that he suffered from depression and anxiety, there is no evidence of any nexus between Wells Fargo's alleged conduct and these mental conditions, all of which pre-date any of the conduct about which Njema has complained. WF Suppl. Appx. pp. 320-369.[11] Furthermore,

---

[11] Wells Fargo obtained these records after filing its opening brief and addressed them in its reply. This is because Njema had refused to answer questions regarding his mental health treatment or provide authorizations to Wells Fargo to obtain his medical records. On October 29, 2014, this Court ordered Njema to answer Wells Fargo's discovery regarding his mental health treatment history and to sign an authorization allowing Wells Fargo to obtain his mental health records. Order dated November 4, 2014 [Docket No. 148]; Order dated January 30, 2015, p. 3 [Docket No. 195]. Njema refused to sign the authorizations and Wells Fargo moved for sanctions. [Docket No. 164]. On January 30, 2015, this Court again ordered Njema to sign the authorizations

even accepting as true Njema's allegations that he suffered from dread, anxiety, and fear, these conditions are insufficient to support a claim for intentional infliction of emotional distress.   See Thomas v. UnitedHealth Group, Inc., Civ. No. 12-47 (DWF/JSM), 2014 WL 5307579, at *16 (D. Minn. Oct. 16, 2014), aff'd –Fed. Appx.--, 2015 WL 2237462 (8th Cir. May 14, 2015) (plaintiff's statement that she was "numb, nervous, anxious and tearful" and had a burning, tight chest insufficient to state a claim for intentional infliction of emotional distress); Besett v. Wadena County, Civ. No. 10–934 (JRT/LIB), 2010 WL 5439720 at *17 (D. Minn. Dec. 7, 2010) (citing cases rejecting depression, a fear of answering door or telephone, impaired ability to trust, damaged relationships with children, vomiting, skin rashes, stomach disorders, high blood pressure, crying spells, avoidance of social interaction, humiliation, embarrassment, insomnia, unsteady nerves, difficulty sleeping, anxiety, lightheadedness, and shortness of breath as sufficient to support a claim for intentional infliction of emotional distress); Langeslag v. KYMN, Inc., 664 N.W.2d 860, 868-69 (Minn. 2003) (rejecting stomach pain, hair loss, weight loss and skin rash as sufficient evidence of intentional infliction of emotional distress).

---

and answer the discovery.  Order dated January 30, 2015, p. 5.  Njema complied.  At the conclusion of the hearing on the summary judgment motion on March 13, 2015, the Court ordered additional discovery on Njema's trespass claim and the Court then allowed supplemental briefing, limited to the issue of trespass.  Order dated March 19, 2015 [Docket No. 206]; Order dated April 7, 2015 [Docket No. 208]; Order dated May 11, 2015 [Docket No. 216].  Njema raised the issue of emotional damages in connection with his trespass claim, asserting that he suffered severe emotional distress.  Pl.'s Suppl. Mem., p. 15.  Instead of citing to any objective evidence in his recently-produced mental health records to support this statement, Njema cited only his original affidavit. Id. (citing Njema Aff., ¶26).  The Court construed this as an admission that the mental health records provided to the Court by Wells Fargo in connection with its Reply, did not support his assertions regarding the severe emotional damages he claims to have suffered.

Having failed to garner evidence to support the elements of a claim of intentional infliction of emotional distress, the Court recommends that summary judgment be granted against Njema on this claim.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

Defendant's Motion for Summary Judgment [Docket No. 188] be **GRANTED** in part and **DENIED** in Part.  Counts 1, 2, 3 (Intentional Misrepresentation), 4 and 5 should be dismissed with prejudice.  Second Count 3 (trespass) should be allowed to proceed.

Dated: July 7, 2015                                        *Janie S. Mayeron*
                                                            JANIE S. MAYERON
                                                            United States Magistrate Judge

## NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 21, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within 14 days after service thereof.  All briefs filed under this Rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.